IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **PEGGY FORAKER**, | Case No. 3:14-cv-87-SI |
| Plaintiff, | |
| v. | **OPINION AND ORDER AFTER PHASE II TRIAL** |
| **USAA CASUALTY INSURANCE COMPANY**, | |
| Defendant. | |

Stephen C. Hendricks, HENDRICKS LAW FIRM PC, 30088 SW Egger Road, Hillsboro, OR 97123; Heather A. Brann, HEATHER A. BRANN PC, PO Box 11588, Portland, OR 97211. Of Attorneys for Plaintiff, Peggy Foraker.

Robert S. McLay, DKM LAW GROUP LLP, 201 Spear Street, Suite 1100, San Francisco, CA 94105; Joshua N. Kastan, DKM LAW GROUP LLP, 1050 SW Sixth Avenue, Suite 1100, Portland, OR 97204; Jessica J. Ross, DKM LAW GROUP LLP, 535 Pacific Avenue, Suite 101, San Francisco, CA 94133; Matthew C. Casey, BULLIVANT HOUSER BAILEY PC, One SW Columbia Street, Suite 800, Portland, OR 97204. Of Attorneys for Defendant, USAA Casualty Ins. Co.

**Michael H. Simon, District Judge.**

Plaintiff Peggy Foraker ("Foraker") brings this lawsuit against her automobile insurance carrier, Defendant USAA Casualty Insurance Company ("USAA"). Foraker's claims arise out of a car accident in January 2012, when an uninsured driver caused her serious injuries. In her original Complaint, Foraker alleged separate claims of breach of express contract and breach of

the implied covenant of good faith and fair dealing. She also alleged financial abuse of a vulnerable person, in violation of Or. Rev. Stat. § 124.005 ("ORS"), *et seq*.

The Court bifurcated this case into two phases. At Phase I, the Court determined, after the parties waived their right to a jury and the Court conducted an eight-day bench trial, that an uninsured motorist caused personal injury to Foraker in the total amount $1,922,338. Shortly after this Phase I finding by the Court, USAA paid Foraker $1 million, which was the policy limit of her uninsured motorist coverage. The Court later awarded Foraker her attorney fees at Phase I, in the total amount of $1,358,748, including a 1.5 multiplier. The Court also dismissed Foraker's claims of breach of express contract and financial abuse of a vulnerable person.

On September 16-17, 2019, the Court conducted a second bench trial, at Phase II. The purpose of this trial was to consider Foraker's claim of breach of the implied covenant of good faith and fair dealing. Foraker alleged that USAA breached its implied covenant of good faith by failing to investigate and resolve her insurance claim in a timely, thorough, and reasonable manner, causing additional damage to Foraker beyond her policy limit payment of $1 million and her Phase I attorney fee award. This Opinion and Order finds facts and reaches conclusions of law to resolve Foraker's Phase II claim against USAA.

## BACKGROUND

On January 4, 2012, Foraker suffered serious personal injuries in an automobile collision caused by an intoxicated, uninsured motorist evading law enforcement. The next day, Foraker reported the accident to her insurer, USAA. More than a year later, USAA had paid Foraker $159,329.76 for covered medical expenses, but nothing else. On April 8, 2013, Foraker, representing herself, made a demand against USAA for $1 million, the limit of her policy's uninsured motorist ("UM") coverage with USAA. On May 30, 2013, Foraker and USAA agreed to an "open extension" of time for USAA to respond to Foraker's demand.

On November 14, 2013, USAA offered to pay Foraker $250,000 to resolve her UM claim. Foraker rejected USAA's offer and did not counteroffer. On December 16, 2013, Foraker, represented by counsel, sued USAA in Oregon state court. USAA removed the lawsuit to federal court under diversity jurisdiction. The case was assigned to U.S. District Judge Anna Brown.

USAA moved to dismiss Foraker's claim of financial elder abuse as premature. Judge Brown granted the motion. Judge Brown explained that Foraker may not maintain a statutory claim for financial abuse of a vulnerable person until after the amount of any money that USAA may owe Foraker had been determined.

In June 2014, Foraker filed her First Amended Complaint. Soon after, Judge Brown bifurcated Foraker's implied covenant claim from her claim for breach of express contract. The parties stipulated to a bench trial. Foraker also moved for partial summary judgment, which Judge Brown granted in part, determining that the other driver was 100 percent at fault for the accident. Foraker's damages, however, still needed to be determined.

Judge Brown held an eight-day bench trial, from January 25 to February 3, 2016, at Phase I of this lawsuit. Judge Brown found that the intoxicated driver's negligence was a substantial contributing factor that caused Foraker's injuries and that Foraker suffered $1,172,338 in economic damages and $750,000 in noneconomic damages. On February 19, 2016, USAA paid Foraker $1 million, the policy limit of her UM coverage.

The parties then cross-moved for summary judgment on Foraker's claim of breach of express contract. Judge Brown granted USAA's motion and denied Foraker's motion. Judge Brown explained that because USAA had an open-ended extension and never formally denied Foraker's UM claim and USAA paid Foraker $1 million promptly after Judge Brown rendered her decision on the amount of Foraker's damages, USAA did not breach any express term of its

contract with Foraker. Judge Brown also determined that because Foraker commenced litigation during the claims negotiation process, she effectively "short-circuited" the claims process before any expiration of the open-ended extension of time for USAA to state its final position on Foraker's policy-limits demand.

On November 4, 2016, Judge Brown sua sponte recused herself from the remainder of this case, which is Phase II. On November 8, 2016, the lawsuit was transferred to the undersigned district judge. In April 2017, Foraker filed a Second Amended Complaint, adding claims for declaratory relief and common law negligence *per se*. On July 26, 2017, the Court dismissed Foraker's new claims. *Foraker v. USAA Cas. Ins. Co.*, 2017 WL 3184716 (D. Or. July 26, 2017).

In November 2017, Foraker petitioned for her Phase I attorney fees, under ORS § 742.061. Foraker sought a lodestar amount of $926,950 with a multiplier of 2.0. Although USAA disputed only a small portion of the lodestar amount, USAA opposed any multiplier. At the time, a case involving different parties but considering the standards for awarding an attorney-fee multiplier under Oregon law was pending before the Ninth Circuit. On August 15, 2018, the undersigned granted in part Foraker's motion for Phase I attorney fees. The Court awarded Foraker a lodestar amount of $873,720 (representing $926,950 minus $53,230) times a multiplier of 1.5, for a total fee award of $1,310,580. On October 17, 2018, the Court granted Foraker a supplemental Phase I fee award in the amount of $48,168. Thus, through Phase I, USAA paid (or become obligated to pay) Foraker $2,358,748.

Phase II involves Foraker's remaining claim against USAA for breach of the implied covenant of good faith and fair dealing under USAA's insurance contract. Foraker moved for partial summary judgment on the liability portion of that claim, and the Court denied Foraker's

motion. On September 16–17, 2019, the Court conducted a two-day bench trial on Phase II. During this trial, six witnesses testified live, the parties submitted, and the Court reviewed, deposition testimony for several other witnesses, and the Court received in evidence more than 100 exhibits. The parties requested an opportunity to submit post-trial briefs and written closing arguments, which the Court allowed. This Opinion and Order reflects the Court's findings of fact and conclusions of law at Phase II.

## DISCUSSION

In Phase II, Foraker contends that USAA breached its implied covenant of good faith and fair dealing by failing to conduct a reasonable investigation of Foraker's 2012 UM insurance claim. Had USAA done so, Foraker maintains, USAA would have paid Foraker the policy limits of $1 million well before USAA eventually did so on February 19, 2016. Foraker further asserts that had USAA conducted a reasonable investigation based on all information available to USAA, then: (1) Foraker would have had the use of that $1 million well before February 2016; (2) she would not have needed to sue USAA and thus would not have incurred litigation costs in Phase I of this lawsuit; and (3) she would not have suffered additional personal injuries that she alleges were caused by USAA's delay in paying its UM policy limit.[1] Foraker also seeks an award of her Phase II attorney fees, under ORS § 746.061.

The facts that are in dispute on which the Court relies in reaching its conclusions at Phase II are supported by the record under a standard of preponderance of the evidence. Unless

---

[1] The Court previously explained that Oregon law recognizes a limited exception to the general rule excluding recovery of noneconomic damages in breach of contract cases when the breach causes physical injury, physical harm, or physical pain. *See* ECF 340. Under certain circumstances, emotional distress damages arising from such physical injury also may be recoverable. *Keltner v. Washington County*, 310 Or. 499, 502 (1990). The leading case in Oregon applying this exception is *Coffey v. Nw. Hosp. Ass'n*, 96 Or. 100 (1919).

otherwise noted, when evidence is subject to an evidentiary objection and the Court has relied on that evidence, the Court has overruled the evidentiary objection for the reason or reasons identified either by the Court or, if the Court is silent, by the party offering the evidence in response to the other side's objection. When the Court has declined to consider evidence subject to an objection, the Court will so indicate and expressly state the basis for sustaining the evidentiary objection. All other objections to evidence that the Court has not relied on or cited in this Opinion and Order are denied as moot. After reviewing the evidence, the parties' objections to the evidence, and the parties' pretrial and post-trial submissions, the Court makes the following findings of fact and conclusions of law, under Rule 52(a) of the Federal Rules of Civil Procedure. Any finding of fact that constitutes a conclusion of law is adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is adopted as a finding of fact.

The parties agree that Oregon contract law governs this dispute, so the Court begins by stating the relevant legal principles. The Court next reviews the evidence to determine whether USAA breached its implied covenant of good faith and fair dealing. After concluding that USAA did breach its implied covenant of good faith, the Court separately addresses each of Foraker's three categories of claimed damages.

**A. Applicable Oregon Contract Law**

In Oregon, "[t]he law imposes a duty of good faith and fair dealing in the performance and enforcement of every contract." *Hampton Tree Farms, Inc. v. Jewett*, 320 Or. 599, 615 (1995); *see also Uptown Heights Assocs. Ltd. P'ship v. Seafirst Corp*., 320 Or. 638, 645 (1995) ("every contract contains an implied duty of good faith"). The duty of good faith and fair dealing effectuates the reasonable contractual expectations of the parties. *See Best v. U.S. Nat'l Bank*, 303 Or. 557, 565 (1987). The purpose of this implied duty "is to prohibit improper behavior in the performance and enforcement of contracts, and to ensure that the parties 'will

refrain from any act that would have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Klamath Off-Project Water Users, Inc. v. Pacificorp*, 237 Or. App. 434, 445 (2010) (quoting *Iron Horse Eng'g v. Nw. Rubber*, 193 Or. App. 402, 421 (2004)). A party may violate the covenant of good faith and fair dealing without breaching the express terms of the contract. *Id.* The covenant, however, "'cannot contradict an express contractual term, nor otherwise provide a remedy for an unpleasantly motivated act that is expressly permitted by the contract.'" *Id.* (quoting *Zygar v. Johnson*, 169 Or. App. 638, 645 (2000); *Glob. Exec. Mgmt. Sols., Inc. v. Int'l Bus. Machs. Corp.*, 260 F. Supp. 3d 1345, 1377 (D. Or. 2017) (same).

Although a claim alleging breach of an express provision of a contract is related to a claim alleging breach of the implied covenant of good faith, each claim is distinct. *See Morrow v. Red Shield Ins. Co.*, 212 Or. App. 653, 663 (2007) (holding that the defendant insurer was entitled to summary judgment on the plaintiffs' claim of breach of an express provision of a contract but allowing the plaintiffs' claim of breach of the implied duty of good faith and fair dealing based on the same facts to proceed to trial); *accord Veloz v. Foremost Ins. Co. Grand Rapids, Michigan*, 306 F. Supp. 3d 1271, 1281 (D. Or. 2018) (stating that "[t]he law should not allow every breach of contract, even those accidental, inadvertent, or caused by honest mistake to deliver to plaintiff a successful additional claim for the breach of the duty of good faith").

When a party materially breaches a contract, including breaching the contract's implied covenant of good faith, the non-breaching party generally has a right to recover that party's expectation interest. *Zehr v. Haugen*, 318 Or. 647, 658 (1994). As explained by the Oregon Supreme Court:

> The purpose of the remedy of damages for a breach of contract claim is to compensate the plaintiff for the loss *incurred as a result*

> *of the defendant's breach*. As pertinent here, that compensation
> may be accomplished by placing the aggrieved party in the
> position that he or she would have occupied had the contract been
> fully performed, that is, by compensating the party according to his
> or her "expectation interest."

*Id.* (emphasis added). The phrase "incurred as a result of the defendant's breach" is simply another way to express causation. *See* RESTATEMENT (SECOND) OF CONTRACTS § 347(a), (b) (explaining that a party injured by a breach of contract has a right to recover damages for losses "caused" by the breach); *see generally* Daniel P. O'Gorman, "Contracts, Causation, and Clarity," 78 U. PITT. L. REV. 273 (2017); *see also* E. Allan Farnsworth, CONTRACTS 731 (4th ed. 2004) ("There is, of course, a fundamental requirement, similar to that imposed in tort cases, that the breach of contract be the cause in fact of the loss.").

Further, consequential damages resulting from the breach are recoverable, if they are reasonably foreseeable. *Id.* (citing *Welch v. U.S. Bancorp*, 286 Or. 673, 70306 (1979) (stating that in a contract action, "consequential damages are recoverable if they are reasonably foreseeable")). Explaining foreseeability, the Oregon Supreme Court has stated:

> All that is necessary, in order to charge the defendant with a
> particular loss, is that it is one that ordinarily follows the breach of
> such a contract in the usual course of events, or that reasonable
> men in the position of the parties would have foreseen as a
> probable result of breach. It is not necessary that the parties should
> have given the matter a moment's thought or should have
> expressed themselves on the subject.

*Cont'l Plants Corp. v. Measured Mktg. Serv., Inc.*, 274 Or. 621, 626 (1976) (quoting 5 CORBIN ON CONTRACTS 79, § 1010 (1964)). *See* RESTATEMENT (SECOND) OF CONTRACTS § 351(1) ("Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made."). In addition, the general rule is that the time to measure damages is as of the time of the breach. *Benson v. Weaver*, 102 Or.

App. 225, 227 (1990), *opinion adhered to as modified on reconsideration on other grounds*, 103 Or. App. 320 (1990).

Finally, damages for breach of contract cannot be recovered if they are too speculative. *Bixler v. First Nat'l Bank of Oregon*, 49 Or. App. 195, 202 (1980). Long ago, the Oregon Supreme Court stated that "the evidence must disclose the damages sustained with reasonable certainty, and they must be shown to be the proximate result of defendant's wrongful acts in violation of its contractual duties." *Parker v. Harris Pine Mills*, 206 Or. 187, 205 (1955). Approximately 20 years later, the Supreme Court explained the term "reasonable certainty" in this context:

> What is actually meant by "reasonable certainty" is discussed in McCormick, DAMAGES 100, § 27 (1935), in which it is stated, * * * "[I]t appears that the epithet 'certainty' is overstrong, and that the standard is a qualified one, of 'reasonable certainty' merely, or, in other words, of 'probability.'"

*Cont'l Plants Corp.*, 274 Or. at 624 (alterations in original). *See* RESTATEMENT (SECOND) OF CONTRACTS § 352 ("Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty.").

## B.  Whether USAA Breached Its Implied Covenant of Good Faith and Fair Dealing

On April 8, 2013, Foraker, an experienced plaintiffs' trial attorney, sent a 24-page single-spaced letter to USAA (plus exhibits), demanding policy limits of $1 million and explaining why that is appropriate under her policy with USAA. Ex. 2.[2] USAA Claims Examiner Susan LeClair ("LeClair") reviewed Foraker's claim file. On July 17, 2013, LeClair valued Foraker's claim in the range of $800,000 ("low") to $1 million ("high"). Ex. 6. On July 23, 2013, USAA set its reserves for this claim at $1 million. LeClair Dep. (Sept. 23, 2016) Tr. at 41:24-42:2.

---

[2] All Phase II trial exhibits received in evidence are referred to as "Ex."

USAA's Large Loss Committee rejected LeClair's valuation without documenting its reasons or analysis. Instead, USAA's Large Loss Committee directed LeClair to obtain a "peer review" of Foraker's medical records. USAA contacted Disability Management Consultants, who retained the services of Dr. Jon Glass ("Dr. Glass"), a board-certified neurologist. Ex. 11.

Dr. Glass gave his written report, dated August 11, 2013, to Disability Management Consultants and USAA. Ex. 11. In that report, Dr. Glass specifically identified all the records that he reviewed. *Id*. at 1 and 8. Dr. Glass also provided the following two conclusions, in relevant part:

> **1.    What injuries are related to this auto accident?**
>
> As a result of the motor vehicle accident, patient had an inner ear concussive injury and cervical radiculopathy requiring surgery. Other symptoms were not related to the accident. . . . Patient was treated for hydrocephalus. Based on review of the imaging, patient was asymptomatic for hydrocephalus on presentation and had a well-compensated obstructive hydrocephalus that was certainly chronic or possibly congenital. *There is no evidence that this was exacerbated by the motor vehicle accident*. . . .
>
> **2.    Specifically address the hydrocephalus, trigeminal neuralgia and traumatic brain injury**
>
> With regard to the hydrocephalus, as detailed in question 1 this appears to be a chronic partially obstructive hydrocephalus that was well-compensated. These may eventually be compensate and become symptomatic; *the hydrocephalus, however, was not related to the motor vehicle accident and there was no evidence that the motor vehicle accident caused it to become symptomatic*.

Ex. 11 at 7 (emphases added). After receiving Dr. Glass's report in August 2013, USAA did not investigate whether Foraker suffered a wage loss or loss of earning capacity. USAA also failed to investigate whether Foraker would likely incur future medical bills.

On November 14, 2013, USAA offered Foraker $250,000 to resolve her UM claim, which Foraker rejected without counteroffer. On December 12, 2013, Foraker retained counsel,

and on December 16, 2013, Foraker, through counsel, sued USAA, before the two-year statute of limitations deadline of January 4, 2014.

Judge Brown determined on summary judgment that the accident was caused solely by the negligence of the uninsured motorist. Thus, the only issue to be resolved at the eight-day bench trial at Phase I was the amount of damages to Foraker caused by the accident. Judge Brown explicitly found that Foraker's preexisting hydrocephalus[3] became symptomatic shortly after the accident and that the accident was a substantial causative factor. Specifically, Judge Brown found at Phase I:

> In addition, although it is clearly plausible Ms. Foraker will continue to need medical care for, among other things, her preexisting hydrocephalus and cervical issues, *both of which became symptomatic shortly after the accident and for which symptomatology I have found the accident was a substantial causative factor*, the plaintiff has not shown that she would have been wholly free from hydrocephalus and cervical issues as she aged had she not been injured in the accident. So I deliberated carefully and discounted that total sum argued, the 622,000 figure, in that range. And I find that $100,000 will reasonably compensate Ms. Foraker now for future expenses she is likely to incur as a result of the injuries she sustained in the accident.
>
> With respect to past and future lost earnings discounted to present value, I find Ms. Foraker did prove this accident was a substantial factor in her not producing any net income, effectively, from her law practice from the time of the accident to the present. And for this element, I find the sum of $500,000 is a reasonable sum to compensate her for past lost earnings as of today.
>
> With respect to future lost earnings, . . . I conclude the sum of 200,000 dollars is reasonable to compensate Ms. Foraker for lost future earnings reduced to present value, for which this accident was a substantial factor.

---

[3] Hydrocephalus is "[t]he accumulation of excessive amounts of cerebrospinal fluid (CSF) within the ventricles of the brain, resulting from blockage or destruction of the normal channels for CSF drainage." TABER'S CYCLOPEDIC MEDICAL DICTIONARY 1102 (21st ed. 2009).

PAGE 11 – OPINION AND ORDER

> So I total past and future lost earnings at 700,000 dollars. . . .
>
> \*   \*   \*
>
> . . . And, in the end, I conclude that 750,000 dollars is reasonable compensation for Ms. Foraker's noneconomic damages.
>
> The total of economic and noneconomic damages is 1,922,338 dollars and 4 cents.

ECF 397-12 at 9-12 (emphasis added).[4] Because $1,922,338 exceeded USAA's UM policy limit of $1 million, USAA paid Foraker $1 million shortly after Judge Brown announced her decision.

The threshold question now at Phase II is whether USAA breached its implied covenant of good faith and fair dealing by offering Foraker only $250,000 to settle her claim and forcing Foraker to sue, when the facts show that USAA was liable for the full UM policy limit of $1 million. In support of her contention, Foraker cites Oregon's Unfair Claim Settlement Practices law, ORS § 746.230. That law provides, in relevant part:

> (1)   No insurer or other person shall commit or perform any of the following unfair claim settlement practices:
>
> \*   \*   \*
>
> (g)   Compelling claimants to initiate litigation to recover amounts due by offering substantially less than amounts ultimately recovered in actions brought by such claimants.

ORS § 746.230(1)(g).

The Court finds that USAA compelled Foraker to initiate litigation to recover amounts due by offering her well less ($250,000) than the amount that she ultimately recovered at Phase I ($1 million). This is prima facie evidence of an unfair claim settlement practice under Oregon's Unfair Claim Settlement Practices law. Further, it is beyond reasonable dispute that when an

---

[4] Judge Brown also found $372,338.04 in economic damages for past medical expenses. ECF 397-12 at 8.

insurer engages in an unfair claim settlement practice that is precisely the sort of "improper behavior in the performance" of a contract that "would have the effect of destroying or injuring the right of the other party to receive the fruits of the contract," and thus it would be a breach of the implied covenant of good faith and fair dealing. *See Klamath Off-Project Water Users*, 237 Or. App. at 445.

The Court previously denied Foraker's motion for partial summary judgment in which she argued that a violation of ORS § 746.230(1)(g) is a *per se* breach of the implied covenant of good faith. *See Foraker v. USAA Cas. Ins. Co.*, 345 F. Supp. 3d 1308 (D. Or. 2018). In that ruling, the Court concluded:

> Moreover, a genuine factual dispute exists on the fact asserted by Foraker in the pending motion of whether USAA "compelled" Foraker to litigate. There are factual issues as to whether Foraker actually had granted USAA an open-ended extension of time to decide Foraker's claim, or whether the extension was contingent on the provision of medical records that were subsequently supplied to USAA. USAA's breach of the implied covenant of good faith and fair dealing will turn on USAA's conduct and Foraker's reasonable expectations in this regard.

*Id* at 1314. During the Phase II trial, however, the parties did not focus on these issues. Instead, they primarily discussed whether USAA acted in good faith in relying on the August 11, 2013 opinion letter from Dr. Glass. Accordingly, the Court returns to that letter.

USAA argues that it was reasonable to *request* a peer review of Foraker's medical records, and the Court so finds. USAA also argues that Dr. Glass *concluded* that although Foraker had hydrocephalus, it was not caused by the accident. From that, USAA contends that the Court should find that USAA did not breach the implied convenant of good faith. Under the specific facts here, however, that does not follow.

The key issue put to Dr. Glass was whether Foraker's hydrocephalus was related to the car accident. As Dr. Glass stated in his conclusions: "the hydrocephalus, however, was not

PAGE 13 – OPINION AND ORDER

related to the motor vehicle accident and there was *no evidence* that the motor vehicle accident caused it to become symptomatic." Ex. 11 at 7 (emphasis added). Thus, Dr. Glass was not saying that he interpreted the medical evidence differently than other doctors. Dr. Glass unequivocally stated that based only on his review of the file there was *no* evidence that the accident caused Foraker's hydrocephalus to become symptomatic. But there was evidence of that in the possession of USAA. It was in the form of other doctors' written medical opinions.

USAA had in its claim file written statements from Gregory J. O'Shanick, M.D; Karleen Swarztrauber, M.D.; Paul Vespa, M.D.; Scott N. Losk, Ph.D.; and Jeff Chen, M.D., Ph.D. The documents from these four medical doctors and one Ph.D. neuropsychologist show, in chronological order:

1. On August 3, 2012, Gregory J. O'Shanick, M.D. wrote to Dr. Karleen Swarztrauber, M.D. about Foraker. Dr. O'Shanick listed his first two "diagnostic impressions" after his initial consultation with Foraker as follows:

> 1. Status Post Road Traffic Incident-01/04/2012
> 2. *Mild Traumatic Brain Injury secondary to #1*

Ex. 19 (emphasis added).

2. On October 9, 2012, Foraker was examined by Karleen Swarztrauber, M.D. Dr. Swarztrauber's chart notes from that visit state that Foraker's "brain MRI shows hydrocephalus, communicating." Ex. 15.[5]

3. On November 29, 2012, Dr. Paul Vespa, M.D., in the Department of Neurosurgery at the UCLA Health System, wrote in his report: "The patient [Foraker] appears to

---

[5] In this context, a "communication" is "[a]n opening or channel between two anatomical or cellular structures." TABER'S CYCLOPEDIC MEDICAL DICTIONARY 497 (21st ed. 2009).

have *hydrocephalus after TBI* [traumatic brain injury]. We will plan on the lumbar drain procedure." Ex. 8 at 1456 (emphasis added).

4.      On February 1 and February 15, 2013, Foraker had a neuropsychological evaluation performed by Scott N. Losk, Ph.D., who practices clinical psychology and neuropsychology. In the summary section of his report, Dr. Losk writes:

> Ms. Foraker is a 63-year-old woman who was involved in a significant MVA [motor vehicle accident] on January 4, 2012. *As a result of this MVA, she had a neck injury that required cervical fusion in the spring of 2012, she developed hydrocephalus that required surgery in November 2012*, and she continues to have pain and cognitive deficits associated with the MVA.

Ex. 17 (emphasis added).

5.      On February 28, 2013, Jeff Chen, M.D., Ph.D. signed his name to a statement agreeing that if Foraker "*had asymptomatic hydrocephalus and suffered even a mild head trauma, the hydrocephalus could become symptomatic* requiring brain surgery to place a shunt to control the flow of the spinal fluid." Ex. 16 (emphasis added).

6.      On June 7, 2013, Karleen Swarztrauber, M.D. signed his name to a statement agreeing that Foraker suffered "*trauma induced hydrocephalus* requiring brain surgery." Ex. 14 (emphasis added).

These documents were not reviewed or considered by Dr. Glass. That is shown by the fact that Dr. Glass identified all the records at he reviewed, and none of these documents were included in Dr. Glass's list. Ex. 11 at 1, 2, and 8. Moreover, when USAA reviewed Dr. Glass's August 11, 2013 opinion letter, it would have been obvious that these key documents were not listed—and thus not considered—by Dr. Glass.

For purposes of Foraker's pending claim, she need not show that USAA intentionally kept these documents from Dr. Glass. Indeed, at trial USAA presented evidence that it sent

PAGE 15 – OPINION AND ORDER

everything that it had to Dr. Glass, and Foraker presented no direct evidence to the contrary. The Court accepts USAA's position on that question.

Thus, the Court will assume that Dr. Glass more likely than not simply overlooked these documents, although that is an odd assumption given the importance of these documents to the primary question before Dr. Glass. In any event, Dr. Glass was acting as USAA's agent in reviewing Foraker's claim file. Further, USAA remains obligated to fulfill its duties under its contract of insurance with Foraker and cannot discharge those duties by delegating them to another, at least without Foraker's consent, which was neither requested nor given. *See* RESTATEMENT (SECOND) OF CONTRACTS § 318 ("Delegation of Performance of Duty").

Moreover, USAA may not engage in willful blindness by relying on Dr. Glass when the evidence in the possession of USAA showed that they had these critical documents from Foraker's treating doctors, among others, but Dr. Glass did not list them as among the documents that he reviewed. USAA agrees that as an insurer it has the obligation to treat Foraker's interests with as much consideration as its own. USAA failed to do so. Although USAA set its reserves for this claim at $1 million on July 23, 2013, consistent with LeClair's valuation, USAA never offered Foraker more than $250,000. After considering all facts presented at trial, as well as Oregon's Unfair Claim Settlement Practices law, ORS § 746.230, the Court concludes that USAA breached its implied covenant of good faith and fair dealing.

**C.  Whether Foraker Has Proven Her Damages Caused by USAA's Breach**

    **1.  Loss of Use of $1 Million Proceeds**

Foraker presents two alternative theories for measuring her loss of the use of $1 million in proceeds, until USAA finally paid that amount on February 19, 2016. First, Foraker contends that she had to liquidate some of her investment assets for living expenses and had she not done so those investment assets would have continued to appreciate. Foraker's expert damages

PAGE 16 – OPINION AND ORDER

witness opines that the value of Foraker's lost investment profits total $553,300. The Court, however, rejects this damage methodology on foreseeability grounds. Foraker presented no evidence that it was reasonably foreseeable to USAA that if it unreasonably delayed paying what it owed, Foraker would need to liquidate investment assets and thereby lose the opportunity that those assets would continue to appreciate in a rising market. *See Welch*, 286 Or. at 703-06 (holding that to be recoverable in a contract action, consequential damages must have been foreseeable at the time the contract was made).

Foraker's second theory is based on the concept of prejudgment interest. Oregon law allows for the recovery of prejudgment interest at the rate of nine percent per annum, on all moneys after they become due. ORS 82.010(1)(a). Although Foraker offers at least three different "start dates," the Court concludes that the most appropriate and objective start date is when Foraker filed her lawsuit against USAA in state court, December 16, 2013. It is difficult for the Court specifically to identify any earlier date for when USAA should have paid Foraker, but it is clear that USAA should not have compelled Foraker to sue to recover what she was owed. *See Benson*, 102 Or. App. at 227 (noting that the general rule is that the time to measure damages is as of the time of the breach).

From December 16, 2013 through February 19, 2016 is two years, two months, and three days, or 794 days, or 2.175 years. Nine percent of $1 million is $90,000, and $90,000 times 2.175 equals $195,750. Foraker is awarded $195,750 in prejudgment interest.

### 2.    Litigation Costs Not Previously Awarded

Foraker presented evidence that because USAA challenged the opinions of every medical provider whom she offered, Foraker was forced to incur $127,132.78 in expert witness costs. Ex. 23. These expenses were not recoverable costs at Phase I, but they are consequential damages reasonably foreseeable to USAA resulting from its breach. Further, USAA does not

appear to contest this portion of Foraker's damages. *See* ECF 503 at 30-31. Foraker is awarded $127,132.78 for her previously unrecovered Phase I litigation costs.

### 3. Personal Injury Damages

#### a. Tinnitus and Hyperacusis

Plaintiff concedes that there was a failure of proof regarding her claims for personal injury damages based on delayed treatment of her tinnitus and hyperacusis. ECF 501 at 40.

#### b. Neuro-rehabilitation

Foraker also seeks personal injury noneconomic damages resulting from USAA's breach of its implied covenant of good faith. Foraker argues that USAA should not have forced her to sue and should have paid her the $1 million policy limit substantially before it did. At the Phase II trial, Dr. O'Shanick testified that earlier rehabilitation therapy likely would have dramatically improved Foraker's outcome had it begun in the fall of 2013, within two years of her accident. Further, Dr. O'Shanick recommended that specific treatment for Foraker at the University of Washington. Dr. O'Shanick added that had Foraker obtained that treatment within two years of her accident her current limitations likely would have been less severe. Foraker testified that she did not obtain that treatment due to lack of funds. Foraker, however, had separate medical insurance at the time but made no inquiries about whether this treatment would be covered by her medical insurance and, if so, what might be the charges or any copays or deductibles. There is simply too much speculation here for the Court to award these noneconomic damages.[6]

Further, although the Court concludes that USAA should not have compelled Foraker to sue, it would require undue speculation to determine when USAA should have paid. The Court has already concluded that it was not unreasonable for USAA to seek "peer review" from

---

[6] *See* n. 1, *supra.*

Dr. Glass. It was only after Dr. Glass provided his opinion letter dated August 11, 2013, that USAA's lack of good faith became manifest. By relying on Dr. Glass's opinion letter that clearly shows that he did not receive (or, perhaps, that he simply overlooked) the key documents and opinions from other medical providers and burying its head in the sand, USAA breached its implied covenant of good faith and failed to treat Foraker's interests with as much consideration as its own. Thus, it appears that USAA's breach occurred sometime in the late summer or early fall of 2013, almost two years after the accident.

In addition, Dr. O'Shanick's testimony was not particularly precise about how Foraker's condition would have been different had she received the treatment that Dr. O'Shanick recommend. Nor was the doctor precise about when he made that recommendation. Considering all these factors, including the principle of avoiding undue speculation and the principle of requiring reasonable foreseeability to recover consequential damages, the Court concludes that Foraker has not proven this aspect of her damages claim.

## CONCLUSION

At Phase II, Foraker is entitled to judgment in her favor in the total amount of $322,882.78. Foraker also may submit her petition for Phase II attorney fees and costs under ORS § 742.061.

**IT IS SO ORDERED**.

DATED this 20th day of April, 2020.

                                            */s/ Michael H. Simon*
                                            Michael H. Simon
                                            United States District Judge